UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ROBERTO RODRIGUEZ,

                Plaintiff,

                -against-

THE UNITED STATES OF AMERICA,

                Defendant.
-------------------------------------------------------------------x

**FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

23-CV-5948 (OEM) (AYS)

ORELIA E. MERCHANT, United States District Judge:

On August 4, 2023, Roberto Rodriguez ("Plaintiff") commenced this action against the United States of America ("Government") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* ("FTCA"). *See generally* Complaint, Dkt. 1 ("Complaint" or "Compl."). Plaintiff seeks damages for injuries suffered when a side mirror of a United States Postal Service ("USPS") truck driven by a USPS employee hit Plaintiff in Shoreham, New York, on August 20, 2021 (the "Accident"). *See id.* ¶¶ 19-58.[1] The Court held a bench trial from April 13, 2026, to April 16, 2026. *See generally* Transcript of Civil Cause for Bench Trial Before the Honorable Orelia E. Merchant United States District Judge ("Tr.").

Having considered the evidence presented at trial, assessed the credibility of the witnesses, and reviewed the parties' post-trial submissions, *see generally* Plaintiff's Proposed Findings of Fact and Conclusions of Law, Dkt. 53 ("Pl.'s Br."); Defendant United States of America's Proposed Findings of Fact and Conclusions of Law, Dkt. 54 ("Gov't Br."), the Court makes the

---

[1] Plaintiff's Complaint originally named the USPS and USPS employee Cyrus Norman as defendants, in addition to the United States of America. *See* Compl. at 1. The Complaint additionally contained a count for negligent entrustment. *See id.* ¶¶ 59-64 ("Count 2"). On March 18, 2026, the Court dismissed the USPS and Cyrus Norman as parties to the action, *see* Order, dated Mar. 18, 2026, and on April 7, 2026, Plaintiff filed a letter stipulating to the dismissal with prejudice of Count 2, *see* Letter from Plaintiff to the Court (Apr. 7, 2026), Dkt. 49.

below findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.  *See* FED. R. CIV. P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").  For the following reasons, the Court concludes that the Government is not liable to Plaintiff for the Accident.

## FINDINGS OF FACT

### A.  Prior to the August 20, 2021, Accident

Prior to August 20, 2021, Plaintiff worked as a landscaper for Roberto's Affordable Landscaping, Inc. ("Roberto's Affordable Landscaping"), a business wholly owned by Plaintiff's long-term partner, Gisela Mejia ("Mejia").[2]  Tr. at 15:7-18:8, 55:7-20.  Mejia started the business on or around the "end of 2020, beginning of 2021."  *Id.* at 15:7-18:8.  Plaintiff was the primary landscaper, and Mejia, Plaintiff and Mejia's son Christopher Rodriguez ("Christopher"), and other family members assisted with the business.  *Id.* at 15:10-17:21, 49:25-51:10.  Plaintiff's highest level of education is "first grade in El Salvador"; he does not "know how to read or write."  *Id.* at 17:10-21.  Plaintiff has worked as a physical laborer "his whole life."  *Id.* at 17:10-18.

Plaintiff was involved in two car accidents prior to August 20, 2021: one in or around 2017, in which Plaintiff's car hit another car, causing that other car's bumper to be replaced, *id.* at 82:23-83:5, and another in or around 2018 or 2019, in which Plaintiff's car was hit by another car that was speeding, requiring Plaintiff's car to be impounded, *id.* at 82:7-22.

### B.  The Accident

On August 20, 2021, Plaintiff was 32 years old and landscaping a property located near the intersection of Otis Lane and Bradley Drive in Shoreham, New York, with Christopher, who was

---

[2] Although Plaintiff and Mejia referred to themselves as spouses at trial, *see, e.g.*, at Tr. at 14:17-21, 86:14-15, Plaintiff acknowledged that they are not, in fact, legally married, *see id.* at 162:17-18.

approximately ten years old at that time. *Id.* at 170:2-18, 176:6-8, 388:21-390:3.

That same day, USPS employee Cyrus Norman ("Norman") was delivering mail within the scope of his employment in the same neighborhood. *Id.* at 388:5-390:19. Norman was driving an "LLV" truck, *id.* at 388:8-10; *see also* Pl.'s Ex. 5 (displaying a photograph of the truck),[3] which required him to operate the vehicle from the right-hand side, Tr. at 401:13-16. Norman was aware of a blind spot created by the mirrors on the LLV trucks and, over the years of his employment with the USPS, had spoken to his superiors about it. Tr. at 403:20-24, 404:12-16. On the date of the Accident, Norman had worked for the USPS for approximately 17 years and had been driving this particular route for approximately two years. *Id.* at 388:11-20. His license had been expired for "about . . . a week" but had never been suspended. *Id.* at 398:19-25.

As Norman made a right turn from Bradley Drive to Otis Lane, Norman noticed the mirror on the right side of the truck "get pushed in toward the truck," *id.* at 389:25-390:5, and make a "loud squeak," *id.* at 405:3-14. According to Norman, he was traveling "at least five miles per hour, if that," *id.* at 406:15-18, and he immediately came to a stop approximately "a foot or two from the curb," *id.* at 390:9-19, 392:14-25. Norman stated that the truck's tires never made contact with the curb. *Id.* at 393:1-3.

Once stopped, Norman observed Plaintiff for the first time, "standing by the curb," with "one foot on the lawn and one foot on the street." *Id.* at 390:9-23. Norman did not see Plaintiff until that point. *Id.* at 405:3-24. He did not observe Plaintiff fall to the ground and noted that Plaintiff was wearing a leaf-blower backpack. *Id.* at 390:24-391:17. Norman testified that he also saw Christopher approximately "15 feet or so" away from the truck "on the front lawn towards . . . the front door of the house." *Id.* at 393:4-15.

---

[3] The Court refers to Plaintiff's admitted trial exhibits as "Plaintiff's Exhibit" or "Pl.'s Ex." and the Government's admitted trial exhibits as "Government's Exhibit" or "Gov't Ex."

Plaintiff, by contrast, denied stepping onto the roadway and testified that he was standing on the grass. *Id.* at 92:12-94:16. Plaintiff asserted that he had just finished using a weed whacker and was approximately two feet from the curb when he was hit from behind on his lower back and head. *Id.* at 90:25-91:2, 95:4-6, 122:2-123:17. He testified that he had his back to the road and was looking up at the house he was landscaping right before he was hit by the USPS truck, *id.* at 90:25-91:2, which "came up on the grass," *id.* at 159:11-14. He stated that the impact pushed him about "[f]our or five feet" forward. *Id.* at 95:17-24. Plaintiff contended that he immediately felt pain in his "lower back." *Id.* at 95:25-96:4.

Plaintiff additionally testified that he believed Christopher's hand was grazed by the truck. *Id.* at 132:2-7. Plaintiff claimed that his son was "very close" to him and was "coming right toward[]" him when Norman struck Plaintiff. *Id.* at 132:11-12.

Christopher testified that he saw the truck driving "maybe 20 miles per hour on the turn" before it hit his father, *id.* at 171:4-11, and that he was "a couple feet away from [Plaintiff]" at the moment of impact, *id.* at 173:5-8. He testified that the right mirror contacted the "back of [Plaintiff's] head and his back," *id.* at 174:1-4, causing the mirror to push back, *id.* at 173:16-18, and his father to stumble forward "a couple feet," *id.* at 173:24-25. Christopher indicated that the USPS truck's mirror "just grazed [his own] arm" but that he was not injured. *Id.* at 174:20-175:3.

After the impact, Norman approached Plaintiff, "apologized[,] and asked if he was ok," but Plaintiff did not say anything. *Id.* at 391:18-392:8. Norman stated that he told Plaintiff that he was going to have to report the Accident, at which time Plaintiff indicated that he "didn't have the time for this and . . . had to go." *Id.* at 391:24-392:6. Norman testified that Plaintiff then "went back to work." *Id.* at 392:7-8.

Plaintiff called his postmaster, Margaret Haviland ("Haviland"), who arrived approximately ten minutes later. *Id.* at 392:9-13, 394:8-13, 410:16-18. Haviland testified that, when she arrived at the scene, she observed Plaintiff "leaf blowing." *Id.* at 410:20-411:4. Norman subsequently filled out a police report and paperwork for the USPS. *Id.* at 395:24-396:4; Pl.'s Ex. 2 (attaching the police report); Pl.'s Ex. 3 (attaching Norman's USPS statement); Pl.'s Ex. 9 (attaching Norman's Motor Vehicle Accident Report). Per USPS protocol, Norman was then suspended for approximately two weeks and required to undergo training. *See* Tr. at 395:11-23, 417:5-419:1.

Plaintiff asserted that he did not say anything to Norman. *Id.* at 96:6-7. He testified that Norman "was very nervous and . . . was busy calling someone on the telephone." *Id.* at 96:6-7. Plaintiff himself felt "nervous" and "like [he] was in shock." *Id.* at 95:10-11. He called Mejia. *Id.* at 95:15-16. While waiting for Mejia to arrive, Plaintiff spoke to police officers and to emergency medical technicians ("EMTs") who arrived at the scene. *Id.* at 96:21-98:3. Plaintiff testified that he told the EMTs that his "back hurt" but declined to go by ambulance to the hospital since his "wife was on her way." *Id.* at 98:4-12. Plaintiff testified that he wore a back brace after the Accident and, in doing so, alternated between asserting that the back brace had been in his car prior to the Accident and asserting that Mejia brought him the back brace after the Accident. *Id.* at 160:18-162:15.

## C. Plaintiff's Medical Treatment

After arriving at the scene of the Accident, Mejia brought Plaintiff and Christopher back to their home to drop off their equipment. *Id.* at 22:7-12. Mejia then took Plaintiff to the emergency room at St. Charles Hospital in Port Jefferson, New York ("St. Charles Hospital"). *Id.* at 22:11-16; *see also* Pl.'s Ex. 13 (attaching the St. Charles Hospital records).

At the hospital, Plaintiff's back was assessed. *See* Pl.'s Ex. 13 at 1-8. Plaintiff reported that he had "moderate-severe pain to the mid back/lower back region, nonradiating, aching, worse with movement/palpitation, better at rest." *Id.* at 1. He denied "any loss of consciousness, nausea, vomiting, vision changes, dental pain, chest pain, shortness of breath, numbness or tingling to the bilateral upper lower extremities, [and] extremity weakness." *Id.* Among other things, the hospital team ran tests and scans, including computed tomography ("CT") scans of Plaintiff's cervical, thoracic, and lumbar spine. *Id.* at 6-7. As to his cervical spine, Plaintiff's physical exam was "[n]ormal," with "[n]o tenderness, bony tenderness or crepitus." *Id.* at 2. A CT scan confirmed "normal height and alignment" of the "vertebral bodies" and "[n]o evidence of acute displaced fracture or subluxation." *Id.* at 6. As to his thoracic and lumbar spine, Plaintiff's physical exam revealed "[s]pasms and tenderness," with "[d]ecreased range of motion" and "[n]o swelling or edema." *Id.* at 2. CT scans of Plaintiff's thoracic and lumbar spine indicated "normal height and alignment" of the "vertebral bodies." *Id.* at 6-7. There was "[n]o evidence of spondylolysis or spondylolisthesis" and "[n]o evidence of acute fracture or subluxation." *Id.* There were, however, "mild degenerative changes at L5-S1." *Id.* Plaintiff's condition was characterized as "stable," and he was discharged home the same day. *Id.* at 8.

After Plaintiff was discharged from the hospital, he sought treatment at Suffolk Chiropractic & Physical Therapy ("Suffolk Chiropractic") in Shirley, New York, from August 2021 to March 2022. *See generally* Pl.'s Ex. 14 (attaching the Suffolk Chiropractic records). Among other things, that treatment involved physical therapy and trigger-point injections. *See id.* at PLTF000177-90, PLTF000195-26. Plaintiff was additionally referred for magnetic resonance imaging ("MRI") of his spine. *See id.* at PLTF000186.

In mid-September 2021, Plaintiff underwent MRIs of his cervical, thoracic, and lumbar spine at Queens Radiology, P.C., in Astoria, New York ("Queens Radiology"). *Id.* at PLTF000191-93. *Id.* at PLTF000192. As to Plaintiff's cervical spine, the MRI was "[g]rossly unremarkable":

> There [was] maintenance of the lordosis. The vertebrae [were] well visualized and [were] unremarkable in appearance. The interspaces [were] preserved.
>
> The C2-3, C3-4, C4-5, C5-6, C6-7, and C7-T1 interspaces [were] well visualized without evidence of disc bulge or herniation. There [was] no evidence of canal stenosis or neural foraminal narrowing at any of these levels.
>
> The signal characteristics arising from the cervical spinal cord and cranio-cervical junction are unremarkable without evidence of tumor or syrinx.

*Id.* at PLTF000191. The thoracic MRI was similarly "unremarkable":

> There [was] maintenance of the normal thoracic kyphosis. Twelve thoracic vertebra [were] present. They [were] adequately aligned. The marrow signal of the osseous structures [was] unremarkable. The thoracic interspaces [were] preserved.
>
> There [was] no evidence of disc bulge or herniation. There [were] no findings of canal stenosis, and/or neural foraminal narrowing.
>
> The signal characteristics arising from the thoracic spinal cord [were] unremarkable. There [was] no evidence of intraspinal cord tumor or syrinx.

*Id.* at PLTF000192. Plaintiff's MRI of the lumbar spine, however, revealed:

> 1. Muscular spasm.
>
> 2. Multilevel interspace narrowing and dehydration from L3-4 through L5-S1.
>
> 3. Central disc herniation at L3-4, partially effacing the anterior subarachnoid space with left-sided neural foraminal narrowing.
>
> 4. Central disc herniation at L4-5 with bilateral neural foraminal narrowing, lateral recess stenosis, and compression on the exiting nerve roots bilaterally.
>
> 5. Central disc herniation at L5-Sl with bilateral neural foraminal narrowing, lateral recess stenosis, and compression on the exiting nerve roots bilaterally.

*Id.* at PLTF000193.

Plaintiff then sought additional treatment, in the form of pain management and physical therapy, from several other providers, including Orthomed Health, P.C., ("Orthomed") in Patchogue, New York, from April 2022 to July 2023, *see generally* Pl.'s Ex. 15 (attaching the Orthomed records); Gov't Ex. E (same), and Mid Island Medical P.C. ("Mid Island Medical"), also in Patchogue, New York, from January to June 2023, *see generally* Pl.'s Ex. 16 (attaching the Mid Island Medical records); Gov't Ex. D (same).  On April 27, 2022, Plaintiff indicated to his provider at Orthomed that he was "employed landscaping and missed seven days" after the Accident but had "returned to work since."  Pl.'s Ex. 15 at PLTF000240; *see also* Tr. at 145:2-5.[4] Plaintiff stated that he worked full-time and was not taking any medications.  Pl.'s Ex. 15 at PLTF000240, PLTF000242; *see also* Tr. at 146:4-10.[5]

On July 29, 2022, Plaintiff underwent two medical examinations in connection with no-fault insurance claims pertaining to the Accident: an "independent chiropractic examination" performed by Neeti Dureja, D.C. ("Dr. Dureja"), and an "orthopedic independent medical evaluation" performed by Pierce J. Ferriter, M.D ("Dr. Ferriter").  Gov't Ex. N at Rodriguez-Geico-000001, Rodriguez-Geico-000007 (attaching records from Dr. Dureja and Dr. Ferriter); *see* Tr. at 355:18-357:19.  Among other things, both examiners found no limitations to Plaintiff's cervical and lumbar ranges of motion and concluded that Plaintiff "ha[d] no disability."  Gov't Ex. N at Rodriguez-Geico-000003 to -05, Rodriguez-Geico-000010 to -11, Rodriguez-Geico-000018.

From approximately November 16, 2022, to July 2023, Plaintiff continued going to physical therapy at Orthomed but began declining to do his exercises due to being tired after work.

---

[4] Contrary to these records, Mejia testified that Plaintiff was unable to return to the landscaping business in 2021 after the Accident.  Tr. at 45:11-14.

[5] Contrary to these records, Mejia testified that Plaintiff's "lifting capacity was restricted, as well as his bending" in 2022.  Tr. at 48:25-49:4.  She claimed that "he could hardly do anything."  *Id.* at 48:22.

Gov't Ex. E at Rodriguez-Orthomed-0037 to -65.  On December 1, 2022, Plaintiff underwent an electromyography and nerve conduction velocity study ("EMG/NCV") at Orthomed that revealed "evidence of bilateral L4 radiculopathies."  Pl.'s Ex. 15 at PLTF000277.

Plaintiff also reported to his providers that he was working full time in 2023.  *Id.* at PLTF000282-85.  As of January 27, 2023, Plaintiff told Mid Island Medical that he "[was] not taking any medications other than some over-the-counter pills."  Pl.'s Ex. 16 at PLTF000369.  He received a prescription for Cyclobenzaprine and Ibuprofen during that same visit, *id.* at PLTF000372, and a lumbar epidural steroid injection on March 10, 2023, *id.* at PLTF000361.  Plaintiff additionally received a prescription for Percocet on May 19, 2023.  *Id.* at PLTF000367.

On March 30, 2023, Plaintiff had his first appointment with Dr. Philippe Vaillancourt ("Dr. Vaillancourt"), a board-certified neurologist at NYU Langone in Riverhead, New York.  Tr. at 299:11-301:16, 303:1-6.  At that visit, Dr. Vaillancourt diagnosed Plaintiff with spondylosis without myelopathy or radiculopathy in the lumbosacral region.  Tr. at 333:7-9; Gov't Ex. B at Rodriguez-Vaillancourt/NYU-0059 (attaching records from Dr. Vaillancourt).  As defined by Dr. Vaillancourt, spondylosis is "a general term to describe degenerative changes in the spine either in the vertebrae or the discs in between the vertebrae."  Tr. at 317:6-9.  "[A]n acute trauma does not cause acute spondylosis."  *Id.* at 317: 11-12.  In Dr. Vaillancourt's view, spondylosis "wouldn't be unexpected for somebody who is engaged in heavy physical labor," even at Plaintiff's age.  *Id.* at 18-22.

Plaintiff proceeded to see Dr. Vaillancourt approximately three times per year in 2023, 2024, and 2025, with his most recent visit on March 5, 2026.  *Id.* at 352:20-353:2, 361:3-4.  At each visit, Dr. Vaillancourt diagnosed Plaintiff with spondylosis.  *Id.* at 343:24-344:3.  During Plaintiff's most recent visit, on March 5, 2026, Dr. Vaillancourt examined Plaintiff's lumbar range

of motion "by eye," *id.* at 322:6-8, and determined that "he could flex at the waist 50 degrees," an improvement from prior visits, with "[a]bout 80 degrees" being a normal range of motion, *id.* at 316:14-20, 350:13-17, 352:10-354:22. Dr. Vaillancourt acknowledged that this form of testing is subjective, meaning that how far a patient bends is within their control. *Id.* at 350:24-351:3. Dr. Vaillancourt additionally began prescribing Percocet to Plaintiff on July 14, 2023, and has continued to prescribe it to the present. *Id.* at 307:4-8, 319:21-25, 347:17-20. Based on his treatment of Plaintiff, Dr. Vaillancourt opined that the Accident "was the direct cause of [Plaintiff's] current back problems." *Id.* at 316:21-317:5.

Plaintiff first saw board-certified orthopedic surgeon Dr. Joseph Weinstein ("Dr. Weinstein") at Comprehensive Orthopedic & Spine Care in Valley Stream, New York, on July 5, 2023. Tr. at 459:20, 464:4-11. *See generally* Pl.'s Ex. 18 (attaching Comprehensive Orthopedic & Spine Care records); Gov't Ex. K (same). At that visit, Dr. Weinstein ordered new MRIs and CT scans of Plaintiff's cervical and lumbar spine. Gov't Ex. K at Rodriguez-Weinstein/Comprehensive Ortho-0023, Rodriguez-Weinstein/Comprehensive Ortho-0033 to -39.

On July 18, 2023, Kolb Radiology in New York, New York, performed the MRIs and CT scans. *See id.* As to Plaintiff's cervical spine, the CT scan revealed a "posterior disc bulge impinging upon the thecal sac" at C5-C6, with "unremarkable" neural foramina and "mild anterior marginal osteophyte formation at the inferior endplates of C5 and C6." *See id.* at Rodriguez-Weinstein/Comprehensive Ortho-0033. Otherwise, the CT scan was "unremarkable," with "normal vertebral alignment," "no disc bulge or herniation," "no fracture," "no listhesis," "no paraspinal masses or fluid collections," "unremarkable" neural foramina and exiting nerve roots, and "well maintained" intervertebral disc spaces. *Id.* The MRI confirmed this result, listing a

10

"[s]hallow posterior disc bulge at C5-6 mildly impinging upon thecal sac" and otherwise normal results. *Id.* at Rodriguez-Weinstein/Comprehensive Ortho-0034.

The CT scan of Plaintiff's lumbar spine indicated "disc herniations at L4-5 L5-S1 with central and foraminal narrowing"; "[h]erniation LS-S1 impinges upon the bilateral extra thecal S1 nerve roots as well as the bilateral exiting L5 nerve roots"; "[d]isc bulge versus herniation at L3-4"; and "[m]ild grade 1 retrolisthesis of L4 upon L5." *Id.* at Rodriguez-Weinstein/Comprehensive Ortho-0038. It otherwise showed "no [f]racture" or "paraspinal masses or fluid collections." *Id.* The MRI of Plaintiff's lumbar spine confirmed these findings, revealing "[b]road posterior disc herniations at L3-4, L4-5 and L5-S1 with central and foraminal narrowing"; "herniation LS-51 encroach[ing] upon the exiting bilateral L5 nerve roots"; and "[m]ild grade 1 anterolisthesis of L5 upon S1." *Id.* at Rodriguez-Weinstein/Comprehensive Ortho-0036.

Interpreting these findings, Dr. Weinstein diagnosed Plaintiff with "cervical radiculopathy [and] lumbar radiculopathy/spondylolisthesis" on July 19, 2023. *Id.* at Rodriguez-Weinstein/Comprehensive Ortho-0017 to -19.[6] Dr. Weinstein recommended that Plaintiff undergo a spinal decompression and fusion surgery, which Dr. Weinstein performed on Plaintiff at Hudson Regional Hospital in Secaucus, New Jersey, on August 22, 2023. *Id.* at Rodriguez-Weinstein/Comprehensive Ortho-0024 to -26. *See generally* Pl.'s Ex. 19 (attaching Hudson Regional Hospital records); Gov't Ex. L (same).

Dr. Weinstein has not treated Plaintiff as a patient since September 18, 2024, Tr. at 547:22-25; however, he evaluated Plaintiff and produced a narrative report in connection with this litigation on February 19, 2025, *id.* at 547:19-548:11. Among other things, a physical exam of

---

[6] As defined by Dr. Weinstein, radiculopathy "is any sort of nerve pain or nerve symptom, for instance, the numbness, the tingling, the weakness, shooting pain down the leg." Tr. at 479:24-480:1. Spondylolisthesis "is any movement anteriorly or posteriorly" of the vertebrae. *Id.* at 480:3-13.

11

Plaintiff's lumbar spine was "essentially normal, except there was pain to palpation at the paraspinal musculature and . . . decreased range of motion." *Id.* at 491:5-9. Dr. Weinstein observed "55 degrees" of flexion and testified at trial that a normal range of motion is "90 degrees." *Id.* at 491:10-13. Like Dr. Vaillancourt, Dr. Weinstein acknowledged that range-of-motion testing is "subjective" because "a person could go as much as they want to." *Id.* at 542:7-12. Based on his treatment of Plaintiff and subsequent evaluation, Dr. Weinstein concluded that Plaintiff "sustained extensive injuries with permanent disability" and that Plaintiff's injuries were "causally related to the accident of 8/20/2021." Pl.'s Ex. 18 at PLTF000503. Among other things, he recommended that Plaintiff see an orthopedic surgeon "at least 5 times per year," that he "have approximately 20-30 physical therapy sessions per year," that he should have "three lumbar epidural injections per year," "3 cervical epidural injections yearly," as well as CAT scans and "a lumbar and cervical MRI once every 2-3 years." *Id.* at PLTF000504.

Plaintiff has not adhered to Dr. Weinstein's recommendations. He has not seen an orthopedic surgeon since Dr. Weinstein, Tr. at 551:12-14, and Plaintiff's last physical therapy appointment was in March 2024, *id.* at 551:19-21; Gov't Ex. A at Rodriguez-Rocky Point-0056 (attaching medical records from Rocky Point Physical Therapy in Rocky Point, New York). Plaintiff is also not currently receiving any epidural injections. Tr. at 552:3-8. Plaintiff worked as a landscaper in 2024, *id.* at 45:24-46:5,[7] and continues to work as a landscaper today, although for a different company, *id.* at 362:7-20, after Mejia closed Roberto's Affordable Landscaping in

---

[7] At trial, Mejia stated that Plaintiff was able to perform "light-duty work" in the landscaping business in 2024, including "rid[ing] . . . the stand-up mower" to "mow the lawn" and using a "backpack leaf blower" to "blow the sidewalk." Tr. at 45:24-46:5. She stated that "he could not keep the blower on more than . . . a maximum of three to five minutes" or ride the lawn mower for approximately five to 30 minutes. *Id.* at 49:10-20. She also claimed that Plaintiff could not lift bins full of grass clippings. *Id.* at 73:17-74:16. In response, the Government showed Mejia a video, which the Court admitted for impeachment purposes only, displaying Plaintiff lifting a bin over his head on August 16, 2024, and using a lawn mower. *Id.* at 74:17-78:10; *see id.* at 429:1-15; Gov't Ex. U (video 5).

12

October 2025, *id.* at 50:1-10.[8]

At trial, the Government called Dr. Charla Fischer, a board-certified orthopedic surgeon, as an expert. *Id.* at 233:17-20. Dr. Fischer is a professor of orthopedic surgery and attending physician at NYU Langone Health, *id.* at 234:12-18, 236:13-21, who has worked as a spinal surgeon for approximately 14 years, *id.* at 233:1-13, and who has evaluated cervical and lumbar disc conditions between 2,000 and 3,000 times over the course of her career, *id.* at 235:23-236:9. Dr. Fischer has been qualified and opined as a medical expert at trial in approximately eight other cases. *Id.* at 238:3-12. Dr. Fischer examined Plaintiff on April 29, 2025, and reviewed Plaintiff's medical records and imaging in this matter. *Id.* at 239:4-242:5.

Having reviewed Plaintiff's medical records and images and examined him, Dr. Fischer opined, to a reasonable degree of medical certainty, that the Accident did not cause Plaintiff's spinal conditions, *id.* at 242:24-256:10, and that "[p]reexisting degeneration" was the cause of Plaintiff's spinal conditions, *id.* at 255:13-21. Dr. Fischer explained that Plaintiff's CT scans from St. Charles Hospital on August 20, 2021, the date of the Accident, showed "no signs of acute trauma," such as a "fracture or subluxation or bleeding."[9] *Id.* at 243:9-13, 248:17-20. These findings were confirmed by the MRIs taken at Queens Radiology approximately four weeks later in September 2021, which showed "mild broad-based bulging at C5-6" in Plaintiff's cervical spine, *id.* at 243:14-18, and some "central herniations at 3-4, and 4-5, and a broad-based herniation at L5-S1" in Plaintiff's lumbar spine, *id.* at 248:21-24. Dr. Fischer described what disc bulging and central and broad-based herniations are, noting that disc bulging "indicates early degeneration just

---

[8] Mejia testified that she closed the business in October 2025 "[b]ecause [they] couldn't keep up with the work." Tr. at 50:14-15. On cross-examination, Mejia acknowledged that the income of the business increased each year after 2021: it more than doubled from 2021 to 2022 and again from 2022 to 2023. *Id.* at 60:21-61:18.

[9] As Dr. Fischer explained, "subluxation" is "like a dislocation in the spine." Tr. at 246:14-15. "[Y]ou could have a trauma . . . shift[] . . . parts of the joints." *Id.* at 246:15-247:1.

13

due to age," *id.* at 244:10-22, and that central and broad-based herniations, unlike traumatic herniations, are "not associated with trauma," *id.* at 248:25-249:1, but are instead caused by degeneration, *id.* at 249:1-19.[10]  Dr. Fischer noted, as well, that there was no stenosis[11] in the lumbar spine. *Id.* at 249:21-23.  She believed that these findings were consistent with the scans taken on July 18, 2023, which also indicated "no acute trauma to the spine," *id.* at 246:9-13, although they did show some progression in degeneration at the L4-5 level of Plaintiff's lumbar spine, *id.* at 250:3-7.

Further, in Dr. Fischer's opinion, the lumbar fusion surgery was not causally related to the Accident.  Based on her experience, Dr. Fischer would not have recommended a spinal fusion surgery for Plaintiff's lumbar spine because "the accident most likely led to paraspinal sprain, which [she did not] think would be addressed with a spinal fusion surgery." *Id.* at 251:20-23.  While "definitely possible to recommend this surgery with these . . . findings," in her experience, "the outcomes are not great and probably -- the surgery is not going to help all that much, while putting the patient more at risk." *Id.* at 252:3-10.  Dr. Fischer "tend[s] to offer surgery if there's more severe findings and when there is more degeneration, it's going to lead to stenosis, which

---

[10] By "broad-based" disc herniation, Dr. Fischer indicated that she meant "affect[ing] the whole outside part of the disk." Tr. at 245:2-3.  Dr. Fischer explained:

> in the back part of the vertebral bodies runs a ligament, and it doesn't cover the entire back.  There is like a little space.  And then the neuro foramen, or the tunnel where the nerve exits start.  So it's then upper border pedicle board, inferior border pedicle, anterior border, vertebral body wall, and posterior border is the facet joint.  So, this is a really stable structure.  So you have this ligament and then a gap and a really stable structure.  So most of the time when I have seen a traumatic herniation -- actually, every time I have seen a traumatic herniation, the herniation occurs in that gap, so it is kind of like off to the side.  It is also associated with some bleeding as well, the ones that I've seen.  So the fact that these are small herniations or kind of a broad herniation indicates that there's involvement of the central ligament, the posterior longitudinal ligament, which indicates a degenerative cause and not a traumatic cause.

*Id.* at 249:1-19.

[11] Dr. Fischer defined "stenosis" as "tightening.  The central canal can get tightened.  The tunnel where the nerves exit . . . can also get smaller volume." Tr. at 249:24-250:2.

14

can lead to symptoms in the legs." *Id.* at 247:15-17.  Dr. Fischer added that Plaintiff never underwent any surgery for his cervical spine, *id.* at 247:10-12, and did not complain of thoracic spine injuries, *id.* at 247:14-16.

## CONCLUSIONS OF LAW

### A.  Legal Standard

The FTCA waives the Government's sovereign immunity for injuries caused by the negligence of its employees acting within the scope of their employment.  28 U.S.C. § 1346(b)(1) ("[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"); *accord Dooley v. United States*, 83 F.4th 156, 162 (2d Cir. 2023). The law of the state "where the act or omission occurred" governs.  28 U.S.C. § 1346(b)(1); *accord Molzof v. United States*, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law.").  Because the Accident took place in New York, New York law applies.[12]

"Under New York law, a torts plaintiff . . . seeking to prove a defendant's negligence must show '(1) the existence of a duty . . . ; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Dooley*, 83 F.4th at 162 (quoting *Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531, 535 (N.Y. 1981)).  In addition, a plaintiff must establish proximate cause. *Id.* (citing *Mazella v. Beals*, 57 N.E.3d 1083, 1090 (N.Y. 2016)).  "[T]he plaintiff bears the burden of proving the

---

[12] The parties agree that New York law applies.  *See* Pl.'s Br. at 19-34; Gov't Br. at 21.

elements of his claim by a preponderance of the evidence. To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." *Velasquez v. United States Postal Serv.*, 155 F. Supp. 3d 218, 227 (E.D.N.Y. 2016) (quoting *Brown v. Lindsay*, 08–CV–351 & 08–CV–2182, 2010 WL 1049571, at *12 (E.D.N.Y. Mar. 19, 2010)); *see also United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses.").

New York has additionally "adopted a comparative negligence framework" in personal injury actions in which "the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the [plaintiff] . . . bears to the culpable conduct which caused the damages." *Dooley*, 83 F.4th at 163 (quoting N.Y. C.P.L.R. 1411). Where comparative negligence applies, "liability is split between plaintiffs and defendants based on the relative culpability and causal significance of their conduct." *Id.* (quoting *Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 300 (2d Cir. 1997)). A defendant seeking to prove that a plaintiff was negligent bears the burden of proving that negligence by a preponderance of the evidence. *Kane v. United States*, 189 F. Supp. 2d 40, 52 (S.D.N.Y. 2002).

## B.  Application of Law

### 1.  Duty

The Court first assesses the parties' respective duties. Plaintiff argues that Norman, and by extension the Government, was "required by statute to 'exercise due care to avoid colliding with any bicyclist, pedestrian or domestic animal upon any roadway,' and [his] failure to see that which should have been seen through the proper and reasonably expected use of [his] senses . . . constitutes *negligence per se*." Pl.'s Br. at 19 (quoting N.Y. Veh. & Traf. Law

16

§ 1146(a)). The Government does not contest that Norman owed this duty, however, it asserts that Plaintiff violated his own duty as a pedestrian to "avoid acting in a manner that could lead to a collision." Gov't Br. at 21 (quoting *Khan v. Assoc. Deliveries, Inc.*, 05-cv-2273, 2007 WL 2246092, at *5 (E.D.N.Y. July 31, 2007)); *see id.* at 21-22, 24-26.

Both parties owed duties of care. In New York, the Vehicle and Traffic Law defines the rules of the road. *Dooley*, 83 F.4th at 163. Relevant here, the law imposes a duty on motorists to "exercise due care to avoid colliding with any bicyclist, pedestrian, or domestic animal upon any roadway . . . ." N.Y. VEH. & TRAF. Law § 1146(a). "Due care is that care which is exercised by reasonably prudent drivers." *Kane*, 189 F. Supp. 2d at 52 (quoting *Russell v. Adduci*, 528 N.Y.S.2d 232, 234 (3d Dep't 1988)). Put another way, a motorist "has a duty 'to keep a proper lookout and see what can be seen through the reasonable use of his or her senses to avoid colliding with other vehicles.'" *Dooley*, 83 F.4th at 163 (quoting *Carias v. Grove*, 131 N.Y.S.3d 99, 100 (2d Dep't 2020)).

The Vehicle and Traffic Law additionally states that, "[w]here sidewalks are not provided," as is the case here, *see* Gov't Ex. R (attaching photos of the scene of the Accident), a pedestrian is required to "walk only on the left side of the roadway or its shoulder facing traffic which may approach from the opposite direction. Upon the approach of any vehicle from the opposite direction, such pedestrian shall move as far to the left as is practicable." N.Y. VEH. & TRAF. Law § 1156(b); *see also id.* § 1152(a) ("Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to all vehicles upon the roadway.").

Accordingly, both Plaintiff and the Government owed duties of care.

## 2. Breach

Next, the Court analyzes whether these duties were breached. Plaintiff argues that Norman, and by extension the Government, breached his duty of care because he "was inattentive to his surroundings and conceded that he was aware his postal truck had a 'blind spot' . . . Given this admission," Plaintiff contends, "one would have expected Mr. Norman to have taken extreme caution in cornering and making right turns to avoid colliding with another vehicle, a pedestrian, or a small child on a bicycle who might easily have been in this dangerous 'blind spot.'" Pl.'s Br. at 20. Plaintiff asserts that "Norman never saw [him] at any point before he hit him, and did not even know an accident occurred until he heard his mirror 'squeaking' upon impact." *Id.* (emphasis omitted). In response, the Government asserts that "Plaintiff failed to maintain a reasonable standard of care" by standing in the roadway with his back to traffic. Gov't Br. at 25.

Both parties breached their duties of care. In New York, a violation of the Vehicle and Traffic Law "constitutes negligence as a matter of law." *Dooley*, 83 F.4th at 163 (quoting *Desio v. Cerebral Palsy Transp., Inc.*, 994 N.Y.S.2d 681, 682 (2d Dep't 2014)). On the day of the accident, Norman's right-side mirror struck Plaintiff from behind while Plaintiff was standing on the edge of the grass, at the curb, on the corner property he was landscaping near the intersection of Otis Lane and Bradley Drive. Tr. at 90:8-91:7, 388:21-390:19. Norman testified that he did not see Plaintiff prior to striking him because of a blind spot caused by the right-side mirror, which he was aware of prior to the Accident. *Id.* at 390:9-19, 401:6-23, 403:20-24, 405:3-24, 418:3-9; *see also* Pl.'s Ex. 3; Pl.'s Ex. 9 at PLTF000039. Norman did not testify that he checked this blind spot upon making the turn or that he did anything to mitigate the fact that there was a known blind spot. *See, e.g.*, *Kane*, 189 F. Supp. 2d at 53 (finding that a driver breached his duty of care where, among other things, he failed to adjust for a blind spot). Norman thereby breached his duty of

18

care. *See, e.g.*, *Bonilla v. NYS Dep't of Motor Vehicles*, 189 N.Y.S.3d 128, 129 (1st Dep't 2023) (determining that substantial evidence supported an Administrative Law Judge's finding that a driver was negligent where he conceded he did not see the pedestrian he struck but merely guessed where she was due to a known blind spot in his vehicle); *Levin v. City of Rochester*, E2019003733, 2023 WL 2232059, at *4-5 (N.Y. Sup. Ct. Feb. 24, 2023) (finding that a driver breached his duty of care owed to a pedestrian where the driver did not see the pedestrian he struck prior to the accident and could not say whether he checked his blind spot).

Plaintiff also breached his duty of care. Although Plaintiff testified that he was approximately "two feet" from the curb, Tr. at 90:25, photographs from the date of the Accident reveal that Plaintiff was, at most, right on the edge of the grass, Pl.'s Ex. 4 (marking with an x where Plaintiff was standing); Pl.'s Ex. 5 (same). At trial, Plaintiff acknowledged that these photographs depict where he was standing at the time of impact, *see* Tr. at 93:1-24, and Christopher corroborated that his father was "standing where the grass and the curb meet each other," *id.* at 171:18-24, with his back to the road when he was hit, *id.* at 182:23-25. Reports drafted shortly after the Accident indicate the same positioning. *See* Pl.'s Ex. 9 (diagramming where the impact took place), Pl.'s Ex. 8 (same). The Court therefore credits Norman's testimony indicating that Plaintiff had been standing with "one foot on the lawn and one foot on the street." Tr. at 390:22-23.

The Court also credits Norman's testimony that he was traveling "at least five miles per hour, if that," *id.* at 406:15-18, and that he immediately came to a stop approximately "a foot or two from the curb," *id.* at 390:9-19, 392:14-25. The Court does not find Christopher's testimony as to the speed of the truck credible, as Christopher was only ten years old at the time of the Accident and not licensed to drive. *Id.* at 171:9-11 (estimating that the truck was driving "maybe

19

20 miles per hour on the turn"); *id.* at 176:6-8. Nor does the Court find Plaintiff's testimony that the truck "came up on the grass," *id.* at 159:11-14, credible, as Plaintiff did not see the truck before it hit him and conceded that no tire marks were visible in the photographs taken shortly after the Accident, *id.* at 159:20-160:11; Gov't Exhibit R at USA000063, USA000066. No other witness claimed that Norman drove onto the grass, nor is that allegation memorialized in any contemporaneous report. *See, e.g.*, Pl.'s Ex. 2; Pl.'s Ex. 3; Pl.'s Ex. 8; Pl.'s Ex. 9; Pl.'s Ex. 10 (attaching Haviland's Accident statement); Gov't Ex. Q at USA000017 (attaching combined police and USPS records).

Accordingly, the Court finds by a preponderance of the evidence that both Plaintiff and the Government breached their duties of care.

### 3. Causation

Next, the Court analyzes causation. Plaintiff argues that "[t]he acts and omissions of the Defendant Government were the sole proximate cause of this accident, and the Defendant Government has failed to carry their burden of proof to the contrary." Pl.'s Br. at 21. In doing so, Plaintiff relies on the "testimony and records from both of Plaintiff's treating physicians," Dr. Vaillancourt and Dr. Weinstein, who asserted that the Accident "was the sole proximate cause of the spinal injuries sustained by [Plaintiff]." *Id.* at 31. In opposition, the Government argues that Plaintiff failed to prove proximate causation because the opinions of Dr. Vaillancourt and Dr. Weinstein were "conclusory and based on incomplete information" and because the objective medical evidence undermines Plaintiff's argument. Gov't Br. at 28; *see id.* at 26-32.

Plaintiff has failed to establish that the Accident was the proximate cause of his injuries. To prove causation, a plaintiff must show that a defendant's negligence "is a substantial cause of the events which produced the injury." *Dooley*, 83 F.4th at 162 (quoting *Mazella v. Beals*, 57

N.E.3d 1083, 1090 (N.Y. 2016)); *see also Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980) ("To carry the burden of proving a prima facie [negligence] case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury."). This element "turns upon questions of foreseeability" and is "a uniquely fact-specific determination." *Hain v. Jamison*, 68 N.E.3d 1233, 1237-38 (N.Y. 2016). In establishing causation, "a plaintiff is required to present competent, non-conclusory expert evidence sufficient to support a finding . . . that the injury was proximately caused by the accident at issue." *Avlonitis v. United States*, 16-CV-2521 (PKC) (SMG), 2020 WL 1227164, at *7 (E.D.N.Y. Mar. 13, 2020) (quoting *Evans v. United States*, 978 F. Supp. 2d 148, 172 (E.D.N.Y. 2013)).

Here, there is an absence of evidence supporting Plaintiff's contention that his injuries were caused by the Accident. Plaintiff has worked in manual labor "his whole life." Tr. at 17:10-18. Plaintiff was additionally involved in two car accidents prior to August 20, 2021, and had a back brace before the Accident. *Id.* at 82:23-83:5, 82:7-22, 160:18-162:15.[13] Plaintiff is also a smoker and overweight, which are two risk factors for spinal degeneration. *See, e.g.*, Gov't Ex. B at Rodriguez-Vaillancourt/NYU-0057; Tr. at 338:14-342:3, 343:2-8. As Dr. Fischer credibly explained, with a reasonable degree of medical certainty, "[n]one of [Plaintiff's] spinal conditions [were] causally related to the [A]ccident"; rather, his injuries were caused by "[p]reexisting degeneration." Tr. at 255:13-21. Scans of Plaintiff's spine taken from the date of the Accident on August 20, 2021, through to July 18, 2023, show evidence of "normal aging" consistent with

---

[13] The Court notes that Plaintiff changed his testimony on this point when pressed on cross-examination. Tr. at 160:18-162:15. At first, Plaintiff voluntarily stated that he had the back brace in his car prior to the Accident. *Id.* at 160:15-23. When the Government attempted to clarify his testimony, Plaintiff then alternatively claimed that the brace was either already in the car when he bought it or that Mejia had brought it for him after the Accident. *Id.* at 160:25-161:21. The Court credits Plaintiff's initial version of events.

21

Plaintiff's history, *id.* at 245:18-22, and lack evidence of acute trauma, such as bleeding, fracture, or subluxation, *id.* at 242:24-253:10.

Plaintiff's behavior after the Accident reinforces this conclusion.  On April 27, 2022, he told medical providers that he went back to work seven days after the Accident, Pl.'s Ex. 15 at PLTF000240; *see also* Tr. at 145:2-5, and continued to tell his providers that he worked full-time as a landscaper until his spinal fusion surgery on August 22, 2023, two years after the Accident, Pl.'s Ex. 15 at PLTF000240, PLTF000242; *see* Tr. at 146:4-147:7; Pl.'s Ex. 15 at PLTF000282 to -85.  Plaintiff also indicated to his medical providers initially that he was not taking any medications, Pl.'s Ex. 15 at PLTF000240, and appears to have managed his symptoms primarily via physical therapy and pain management appointments at Suffolk Chiropractic, Orthomed, and Mid Island Medical for approximately a year and a half after the Accident.  He did not receive a prescription for anything further until approximately January 27, 2023, Pl.'s Ex. 16 at PLTF000372, and was inconsistent with his recommended courses of treatment: from approximately mid-November 2022 to July 2023, Plaintiff continued going to physical therapy at Orthomed but began declining to do his exercises due to being tired after work, Gov't Ex. E at Rodriguez-Orthomed-0038 to -65, and Plaintiff has additionally not adhered to the various recommendations made by Dr. Weinstein, Tr. at 551:8-21, 552:9-15; Gov't Ex. A at Rodriguez-Rocky Point-0056.  Plaintiff worked as a landscaper again in 2024, Tr. at 45:24-46:5, and continues to work as a landscaper today, *id.* at 362:7-20.[14]

---

[14] As mentioned above, Mejia testified that Plaintiff was unable to return to the landscaping business in 2021 after the accident.  Tr. at 45:11-14.  Mejia also asserted that Plaintiff's "lifting capacity was restricted, as well as his bending" in 2022.  *Id.* at 48:25-49:4.  She claimed that "he could hardly do anything" at that time.  *Id.* at 48:22.  Mejia additionally stated that Plaintiff was able to perform "light-duty work" in the landscaping business in 2024, including "rid[ing] . . . the stand-up mower" to "mow the lawn" and using a "backpack leaf blower" to "blow the sidewalk."  *Id.* at 45:24-46:5.  She stated that "he could not keep the blower on more than . . . [a] maximum of three to five minutes" or ride the lawn mower for approximately five to 30 minutes.  *Id.* at 49:10-20.  She also claimed that Plaintiff could not lift bins full of grass clippings.  *Id.* at 73:17-74:16.

While Plaintiff's experts reached a contrary conclusion, *id.* at 316:21-317:5; Pl.'s Ex. 18 at PLTF000503, their observations actually support the notion that the Accident was not the proximate cause of Plaintiff's injuries.  Plaintiff's treating neurologist, Dr. Vaillancourt, testified that his diagnosis of spondylosis was consistent with a degenerative, rather than traumatic, cause. Tr. at 317:6-12.  He conceded that spondylosis "wouldn't be unexpected for somebody who is engaged in heavy physical labor," even at Plaintiff's relatively young age, *id.* at 317:18-22.  Dr. Vaillancourt similarly acknowledged that "manual labor[,] . . . smoking[,] . . . [and] being overweight" were risk factors for spondylosis.  *Id.* at 338:14-20.  Although Plaintiff's treating spinal surgeon, Dr. Weinstein, testified that spondylosis could be traumatic in nature, *id.* at 477:21-22, he simultaneously acknowledged that trauma associated with a car accident would typically result in "acute herniation," "fracture," "bleeding or inflammation," *id.* at 507:2-10, which were not present on Plaintiff's scans, *id.* at 511:7-16, 514:2-14, 522:4-525:4.  Dr. Weinstein also stated that it would not be "unusual" for someone of Plaintiff's age to have spinal degeneration, *id.* at 476:17-19, and acknowledged that smoking was a risk factor for back pain, *id.* at 503:3-5.

Both treating physicians additionally conceded that their histories of Plaintiff's injuries were based solely on what Plaintiff self-reported, which was shown to be subjective and incomplete at trial.  *See id.* at 345:7-23, 351:13-17, 357:15-22, 364:13-365:5, 505:13-22, 524:17-528:20, 535:4-542:1.  Neither treating physician was able to account for Plaintiff's pre-Accident history or to explain in detail why it should be disregarded, which undermines the reliability and weight that their opinions should be given.  *Evans*, 978 F. Supp. 2d at 172 ("[I]n the absence of an

The Court does not credit Mejia's testimony as to the extent to which Plaintiff was working during those years.  Mejia acknowledged that while she closed the business in October 2025 "[b]ecause [they] couldn't keep up with the work," *id.* at 50:14-15, the income of the business increased each year after 2021: it more than doubled from 2021 to 2022 and again from 2022 to 2023, *id.* at 60:21-61:18.  Mejia was also impeached with a video displaying Plaintiff lifting a bin over his head on August 16, 2024, and using a lawn mower.  *Id.* at 74:17-78:10; *see id.* at 429:1-15; Gov't Ex. U.  Taken together, the Court credits, instead, Plaintiff's contemporaneous medical records.

explanation of the basis for concluding that the injury was caused by the subject accident, and not by other possible causes evidenced in the record, an expert's conclusion that plaintiff's condition is causally related to the subject accident is mere speculation insufficient to support a finding that such a causal link exists." (quoting *Carter v. Full Serv., Inc.*, 815 N.Y.S.2d 41, 43 (1st Dep't 2006))). Indeed, neither doctor began treating Plaintiff until approximately a year and a half to two years after the Accident, Tr. at 303:1-6 (Dr. Vaillancourt stated that Plaintiff first became his patient on March 30, 2023); *id.* at 464:4-11 (Dr. Weinstein testified that Plaintiff first became his patient on July 5, 2023), and both Dr. Vaillancourt and Dr. Weinstein were unaware of key details of how the Accident took place, *id.* at 327:20-329:19, 521:2-23. Moreover, Plaintiff did not offer any other evidence to rebut Dr. Fischer's opinion that his injuries were the result of normal aging over time, rather than the Accident. *See, e.g.*, *Avlonitis*, 2020 WL 1227164, at *7-8 (concluding that a plaintiff failed to prove causation where there was pre-existing wear and tear that he failed to explain); *Sul-Lowe v. Hunter*, 48 N.Y.S.3d 844, 847 (3d Dep't 2017) (finding that a treating physician's opinion that an accident was the cause of the plaintiff's injuries was "speculative" where the treating physician "failed to counter or even address defendant's proof that plaintiff's symptoms were caused by a preexisting condition").

Plaintiff's additional arguments to the contrary are unpersuasive. Plaintiff's contention that "[i]t remained uncontested through any competent proof in admissible form throughout this trial that Roberto Rodriguez had never made any complaints, received treatment, been involved in any prior accidents where he sustained injuries, or had any history of spinal problems before he was struck by the postal truck," Pl.'s Br. at 2, is belied by the objective medical evidence collected on the date of and shortly after the Accident, which revealed degenerative, rather than traumatic, injuries, *see* Pl.'s Ex. 13 at 6-7; Pl.'s Ex. 14 at PLTF000193. The absence of medical

documentation prior to the Accident does not, as Plaintiff argues, Pl.'s Br. at 2-3, affirmatively prove the nonexistence of pre-existing conditions.  The Court similarly declines to consider as substantive evidence the deposition testimony referenced by Plaintiff, in which he purportedly stated only property damage resulted from his prior accidents in or around 2017-2019.  *See* Pl.'s Br. at 2.  The Court admitted deposition testimony solely for the purpose of impeachment since all witnesses were available to testify.  *See* Joint Pretrial Order at 4, Dkt. 52; *see also* FED. R. CIV. P. 32 (regulating the use of deposition testimony at trial).  Moreover, Plaintiff's contention that the CT scans on the date of the Accident and subsequent MRIs "reveal[ed] the complete absence of any significant or severe degenerative disc disease at the levels where Mr. Rodriguez would eventually require multi-level lumbar fusion (L4 through S1) as a result of traumatically induced spondylosis," Pl.'s Br. at 3 (emphasis omitted), is belied by the objective medical evidence of degeneration and no evidence of traumatic injury.  As discussed above, Plaintiff fails to rebut the contention that his spinal degeneration progressed over time as he continued to work as a landscaper with the spinal risk factors of smoking and being overweight, rather than being the proximate result of the Accident.

Accordingly, the Court concludes that Plaintiff has not established that the Accident was the cause of his injuries by a preponderance of the evidence and is precluded from recovering damages.  *See, e.g.*, *Mesimeris v. United States*, 03-CV-0925 (JS), 2006 WL 148911, at \*8-9 (E.D.N.Y. Jan. 17, 2006) (determining that the chain of causation was interrupted where a plaintiff had well-established spondylosis, separate and apart from the accident); *Brodeur v. Cooper*, 582 N.Y.S.2d 724, 725 (2d Dep't 1992) (affirming a jury's conclusion that a car accident was not the "competent producing cause" of the plaintiff's spinal injury where the plaintiff had a pre-existing "block vertebra in her neck" and osteoarthritis and where the plaintiff received a spinal fusion

25

surgery over four years after the accident); *D'Angelo v. Bryk*, 613 N.Y.S.2d 757, 758 (3d Dep't 1994) (affirming a jury's conclusion that an accident was not the cause of a plaintiff's injury where the plaintiff had a pre-existing neck injury obtained in two prior car accidents).

### 4. Serious Injury

Even assuming arguendo that he was able to show that the Accident caused his injuries, Plaintiff fails to establish by a preponderance of the evidence that he suffered a serious injury. To recover for non-economic losses resulting from a car accident in New York, a plaintiff must show that he suffered a "serious injury" under New York's No-Fault Insurance Law. N.Y. INS. LAW § 5104 ("[T]here shall be no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss."); *accord Williams v. United States*, 597 F. App'x 647, 648 (2d Cir. 2015). A "serious injury" is defined as

> a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; or significant limitation of use of a body function or system.

N.Y. INS. LAW § 5102(d). The burden of proof rests on Plaintiff, as the party seeking additional recovery. *Avlonitis*, 2020 WL 1227164, at 5.

Plaintiff argues that he suffered an injury falling within the "significant limitation of use" and "permanent consequential limitation of use" categories of "serious injury." Pl.'s Br. at 22-25. He contends that he "still suffers from . . . significant restriction[s] of motion and loss of use of his lumbar" and cervical spine that are "permanent" in nature. *Id.* at 29-30. The Government responds that Plaintiff has not shown a serious injury because his proffered evidence is subjective in nature and the objective medical evidence at trial showed no more than a minor limitation. Gov't Br. at 32-38.

26

Plaintiff has not met this burden. "Because there is significant overlap with 'consequential limitation' and 'significant limitation,' they are treated together." *Williams v. United States*, 1:09-cv-933 (GLS/CFH), 2014 WL 11460892, at *8 (N.D.N.Y. Jan. 28, 2014) (citing *Toure v. Avis Rent A Car Sys., Inc.*, 774 N.E.2d 1197, 1200-02 (N.Y. 2002)), *aff'd*, 597 F. App'x 647 (2d Cir. 2015). "With the exception that the plaintiff prove permanence to satisfy the 'consequential limitation' definition, 'significant limitation' is essentially identical." *Id.* (citing *Lopez v. Senatore*, 484 N.E.2d 130, 131 (N.Y. 1985)). "'"Consequential" means important or significant,' and 'permanent' means only that 'it operates in some limited way or operates only with persistent pain.'" *Id.* (quoting *Countermine v. Galka*, 593 N.Y.S.2d 113, 116 (3d Dep't 1993)). "[W]hether a limitation of use or function is 'significant' or 'consequential' (i.e., important . . . ) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Id.* at *8 (quoting *Toure*, 774 N.E.2d at 869). Objective medical evidence is required. *Pommells v. Perez*, 830 N.E.2d 278, 282 (N.Y. 2005). Notably, "a 'minor, mild or slight limitation of use [is] classified as insignificant within the meaning of the [no-fault] statute.'" *Williams*, 2014 WL 11460892, at *8 (alterations in original) (quoting *Gaddy v. Eyler*, 591 N.E.2d 1176, 1177 (N.Y. 1992)).

Here, Plaintiff's serious injury claim is based on allegations of herniated discs and loss of mobility in his lumbar and cervical spine. *See* Pl.'s Br. at 22-34. To support this contention, Plaintiff primarily offers MRIs reflecting disc bulges and herniations, an EMG/NCV study indicating radiculopathy, his lumbar fusion surgery, and testimony from Dr. Vaillancourt and Dr. Weinstein, who spoke to restrictions in Plaintiff's range of motion. *Id.* at 24-31.

This evidence is insufficient. To start, the MRIs revealing disc bulges and herniations are not conclusive in and of themselves. *Kearse v. N.Y.C. Trans. Auth.*, 789 N.Y.S.2d 281, 285 (2d

Dep't 2005) ("[A] disc bulge or herniation must be accompanied by objective evidence of the extent of alleged physical limitations resulting from the disc injury."). Dr. Vaillancourt and Dr. Weinstein's assessments of Plaintiff's range of motion do not provide the requisite additional evidence regarding physical limitations because they are based on Plaintiff's subjective reporting of his own pain. *Williams*, 2014 WL 11460892, at \*9 ("The court notes that the loss of [range of motion] 'is insufficient to support an objective finding of a serious injury' 'because it is dependent on the patient's subjective expressions of pain.' In that same vein, '[i]t is fundamental law that "a medical opinion based upon subjective complaints of pain is insufficient to support a claim of serious injury.""" (first quoting *Gillick v. Knightes*, 719 N.Y.S.2d 335, 336 (3d Dep't 2001); and then quoting *Crandall v. Sledziewski*, 687 N.Y.S.2d 812, 814 (3d Dep't 1999))). As are Dr. Fischer's determinations of Plaintiff's range of motion, which Plaintiff references as well. Pl.'s Br. at 6. Indeed, all three experts acknowledged at trial that range-of-motion testing is subjective because it is within the patient's control. *See, e.g.*, Tr. at 254:11-255:10, 350:24-351:3, 542:7-25. This point is further highlighted by the July 29, 2022, assessments made by Dr. Dureja and Dr. Ferriter in connection with Plaintiff's no-fault insurance claims arising out of the Accident, which both found no limitations in Plaintiff's range of motion. Gov't Ex. N at Rodriguez-Geico-000003 to -05, Rodriguez-Geico-0000010 to -11. Moreover, as discussed above in relation to the causation element, Plaintiff's own conduct, including his return to work only seven days after the Accident and his inconsistent medical treatment, casts doubt on the significance and permanence of his injuries. *See, e.g.*, *Avlonitis*, 2020 WL 1227164, at \*5-7 (finding no serious injury where Plaintiff similarly failed to adduce evidence beyond allegations of disc herniations and range-of-motion testing).

Similarly, the fact that Plaintiff underwent a surgery is, without additional evidence, insufficient to establish a serious injury. *See Ferguson v. DeSouza*, 18 Civ. 11625 (GBD), 2022 WL 4133338, at \*4 (S.D.N.Y. Sep. 12, 2022). The EMG/NCV study, which revealed "evidence of bilateral L4 radiculopathies," Pl.'s Ex. 15 at PLTF000277, provides little objective evidence of serious injury, *see, e.g.*, *Williams*, 2014 WL 11460892, at \*9 (determining there was only "little objective medical evidence" of serious injury where Plaintiff put forward only "a raised shoulder, swelling, a popping noise, a single observed muscle spasm, EMG results suggesting '[e]vidence of a subtle right sided brachial plexopathy,' 'somewhat diminished' right triceps reflex as compared to the left, and MRI results showing '[m]inimal tendonosis, distal supraspinatus tendon'" (citation omitted)).

Lastly, as discussed above, Plaintiff's theory of the case is that he had no pre-existing conditions prior to the Accident. *See* Pl.'s Br. at 2. Yet, to the extent that Plaintiff may be understood to be making an alternative argument that the Accident exacerbated pre-existing conditions, *see* Pl.'s Br. at 6, 25 (referring to exacerbation in the context of "serious injury"), Plaintiff has failed to adduce any evidence "distinguish[ing] aggravation of a pre-existing condition from the pre-existing condition itself," *Evans*, 978 F. Supp. 2d at 172 (citing *Dabiere v. Yager*, 748 N.Y.S.2d 38, 39 (3d Dep't 2002)).

Accordingly, the Court concludes that Plaintiff has not established by a preponderance of the evidence that he suffered a "serious injury" under New York law.

## CONCLUSION

For the foregoing reasons, the Court concludes that that the Government is not liable to Plaintiff under the FTCA for the car accident that occurred between him and USPS driver Cyrus

Norman on August 20, 2021.  The Clerk of the Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

_____/s/_____
ORELIA E. MERCHANT
United States District Judge

July 8, 2026
Brooklyn, New York

30